**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 07-26-SLR |
| ) | |
| EARL N. WALLACE, ) | |
| ) | |
| Defendant. ) | |

**GOVERNMENT'S SUPPLEMENTAL BRIEF IN SUPPORT OF ITS PROFFERED
JURY INSTRUCTION FOR 26 U.S.C. § 5861(i)**

On November 6, 2007, the parties submitted their Joint Request for Jury Instructions for the trial in this matter (D.I. 26), wherein two different instructions for the offense of possession of a firearm without a serial number, a violation of 26 U.S.C. § 5861(i), were proffered. Thereafter, the parties submitted letter briefs to the Court in support of their respective positions. On November 13, 2007, at the pretrial conference, the Court heard oral argument on the issue and took the matter under advisement; the following day the Court, upon motion of the government, continued the trial in this case indefinitely and allowed the parties to file supplemental briefing.

The crux of the dispute revolves around the mens rea necessary for a conviction under 26 U.S.C. § 5861(i), a provision of the National Firearms Act ("NFA" or "the Act"). The government maintains that it is not required to prove that the defendant knew that the silencer he possessed lacked a serial number. This position is grounded upon every Circuit Court opinion to address the issue.

The defense mischaracterizes this position as an attempt to completely dispense with a mens rea requirement for a § 5861(i) conviction, and thus violate principles of due process. This is simply incorrect. The government's proffered instruction for § 5861(i) contains an explicit mens rea requirement; namely, that it must prove that the defendant knew that he possessed a "firearm" as defined by the NFA – i.e., he knew he possessed a silencer, a dangerous weapon that should put one

on notice of strict regulation. This instruction was not crafted out of thin air; rather, it has its root in Supreme Court jurisprudence with regard to an analogous provision of the NFA, § 5861(d), in which the Supreme Court crafted the above standard *in light of* due process concerns, as well as principles of statutory construction and the underlying purpose of the statute. Accordingly, the Court should accept the government's proffered jury instruction on § 5861(i).

## FACTUAL BACKGROUND

Ron Cannon is a gunsmith who works out of his home in Chichester, Pennsylvania. On December 18, 2006, he received a phone call from an unidentified individual asking if Cannon could make a silencer for him. The gunsmith refused this request, as it would be illegal for him to do so. After he hung up with the individual, Cannon recorded the phone number – 443.889.0448 – and contacted the Pennsylvania State Police (PSP) about the call. PSP notified special agents of the Bureau of Alcohol Tobacco, Firearms and Explosives ("ATF"), who met with Cannon on December 20, 2006, and after speaking with him, decided to perform an investigation.

On December 20, 2006, in a recorded call made in the presence of an ATF special agent, Cannon called 443.889.0448 and left a message that he would make the silencer; he also stated that they needed to "keep this quiet."

On December 21, 2006, another recorded call was made from Cannon to 443.889.0448. In this call, the unidentified individual answered and the two made an arrangement that the individual would mail a firearm to Cannon at an address in Pennsylvania (a sham address provided by law enforcement). Cannon was specific to mention that he should mail the firearm by regular mail, because UPS employees "x-ray that stuff." Cannon also informed the unidentified individual that "I don't want nobody knowing about this. You can get us in some trouble here," to which the unknown individual said, "Ok." Cannon then faxed the address to a number given to him by the unknown individual, and followed up with a second phone call to make sure that the individual received the fax.

On January 08, 2007, a package was received at the sham address and brought to the PSP Barracks in Media, Pennsylvania. The package was from "Bob Will," with a return address in Maryland that was subsequently discovered by ATF special agents to not exist. In the presence of ATF task force officer ("TFO") John Cargan, the package was opened. In the package was a Colt .45 handgun, along with various items put in place to conceal the presence of the firearm (clothes, bubble wrap, a picture frame and incense).

On January 11, 2007, Cannon made another recorded call to the unidentified individual at 443.889.0448; during this call, the individual identified himself as "Bob." Cannon and "Bob" agreed that Cannon would make him a silencer for the Colt .45, and that they would later meet to exchange money for the silencer. A rest stop in Pennsylvania was tentatively discussed.

Over the next several weeks, "Bob" was unresponsive to Cannon's phone calls – that is, Cannon would leave him messages that were not returned. When "Bob" eventually called Cannon back, Cannon told him that he was turning over the job to his partner, "Eric Holden." "Eric Holden" was the designated undercover identity of TFO Cargan. Cannon told "Bob" to call "Eric" and gave him TFO Cargan's phone number.

On January 25, 2007, "Bob" called TFO Cargan and left a message. TFO Cargan placed a recorded call back to him and confirmed that "Bob" would pay $1,500 for the silencer, and that the two would meet at a spot in Delaware to complete the transaction. In the call, TFO Cargan and "Bob" had the following exchange:

| | |
|---|---|
| CARGAN: | And you'll understand though, this needs to stay, ah, between us. |
| "BOB": | Oh, definitely. You can depend on me, man. |
| CARGAN: | This is something we could, ah, this is something we could get into a bit of trouble with, you understand that? |
| "BOB": | I understand. I mean, you know it's all on me. I know that. |
| CARGAN: | Ok, yeah. I mean, uh. |

|  |  |
|---|---|
| "BOB": | I'm never, I'm never, I'm never gonna call up your name, you know what I mean? |
| CARGAN: | Ok, yeah. Because we could both go to jail for a little while on this. I don't, I don't ah, I'm making money and and you're getting what you need, and I don't want that to happen. |
| "BOB": | Ok, I got you. You can trust me on that. |

A number of other calls were made between "Bob" and TFO Cargan – some recorded and some unrecorded – culminating in the two arranging a meeting point off of I-95 and 896 in Delaware on February 12, 2007. In these calls, "Bob" indicated that he would be driving a silver Isuzu to the meet location.

On February 12, 2007, TFO Cargan arrived at the predetermined meet point in his undercover vehicle. He was wired with a "Kell" recording device that was hidden on his person. He also had a silencer with him to give to "Bob" per the agreement; this silencer was made by ATF's Firearms Technology Branch to fit the specific weapon that "Bob" had sent to them – a Colt .45 handgun.

After waiting at the location, TFO Cargan eventually saw a black male driving a silver Isuzu up to the meet location; the male, while driving, was looking around as if performing surveillance. The male then drove away. TFO Cargan then called "Bob" at 443.889.0448 and told him that he just drove past him. "Bob" eventually drove back to TFO Cargan, got out of his car, and asked Cargan: "You're not no police or nothing, right?" "Bob" then got in TFO's Cargan's car and asked him where the "gun" was. TFO Cargan told "Bob" it was in the trunk of his car, and then proceeded to show "Bob" the silencer by fastening it on to the supposed barrel of "Bob's" Colt .45 that "Bob" mailed to him a month prior.[1] "Bob" held the silencer during part of this discussion. After Cargan finished demonstrating how the silencer worked, he gave the silencer back to "Bob." Both individuals then got out of the car so that TFO Cargan could give "Bob" his gun back from the trunk, at which point "Bob" stated "let's get this thing done."

---

[1] This was actually a prop firearm.

"Bob" was then arrested and determined to be Earl N. Wallace, the defendant. Wallace had $1,500 on his person – the amount previously negotiated for the sale of the silencer. He later gave a post-Miranda statement admitting to buying the Colt .45 from a man he worked with in 2003, and to having a conviction from Maryland for possessing a handgun in a vehicle.

### ARGUMENT

As the government indicated in its initial letter brief to the Court, every Court of Appeals to address the issue has concluded that the government is not required to prove knowledge of a firearm's lack of serial number under 26 U.S.C. § 5861(i). See United States v. Michel, 446 F.3d 1122, 1130 (10th Cir. 2006) ("Although the government was required to prove [the defendant] knew the gun was a sawed-off shotgun, it was not required to further prove he knew it was supposed to be registered *or that it lacked a serial number*.") (emphasis added); United States v. Ruiz, 253 F.3d 634, 637-39 (11th Cir. 2001) ("The government does not need to prove that a defendant knew that the 'firearm' in question under 5861(i) did not have a serial number."); United States v. Turnbough, 1997 Nos. 96-2531 & 96-2677, 1997 WL 264475, at *3 (7th Cir. May 14, 1997) ("Finally, because § 5861 is a regulatory measure, the government need not prove that [the defendant] knew that the handgun lacked a serial number."); United States v. Smith, No. 96-10044, 1997 WL 222328, at *1 (9th Cir. April 30, 1997) ("Specific knowledge that the gun lacked a serial number is not an element of the offense, therefore defendant's contention and motion on that issue is meritless.").

The rationale for these decisions is largely predicated on Supreme Court jurisprudence interpreting § 5861(d), a companion subsection to § 5861(i). Specifically, the Supreme Court has concluded, for mens rea purposes with regard to § 5861(d), that the government must only prove the defendant had knowledge of the characteristics of his weapon that made it a statutory "firearm" under the NFA. Establishing this type of knowledge, the Court reasoned, shows that the individual understands that he is dealing with a weapon that is subject to strict regulation, and therefore possible criminal sanction for its possession. Accordingly, knowledge of whether the "firearm" in question actually complied with the NFA's regulation(s) is not a necessary element for conviction.

To understand this rationale and how it applies to the present case, a brief description of the NFA's scope and background is helpful, as well as a summary of two Supreme Court cases interpreting the NFA vis-a-vis § 5861(d).

### A. The NFA's Scope and Background

The NFA is a statute that, by design, regulates certain highly dangerous weapons – primarily weapons that are associated with "gangsters" and criminal activity, such as the silencer at issue in this case. See Staples v. United States, 511 U.S. 600, 626-27 (Stevens, J. dissenting) ("In 1934, when Congress originally enacted the statute, it limited the coverage of the 1934 Act to a relatively narrow category of weapons such as submachine guns and sawed-off shotguns – weapons characteristically used only by professional gangsters like Al Capone, Pretty Boy Floyd, and their henchmen."); Conf. Rep. No. 90-1956, 90th Cong., 2nd Sess. 1968, 1968 U.S.C.C.A.N. 4426, 4434 (1968) ("The present National Firearms Act covers *gangster-type* weapons such as machineguns, sawed-off shotguns, short-barreled rifles, mufflers, *and silencers*.") (emphasis added). Indeed, as the Third Circuit has recently described the NFA, "[i]t is evident 'from the face of the Act that the [NFA]'s object was to regulate certain weapons likely to be used for criminal purposes.'" United States v. Introcaso, 506 F.3d 260, 267 (3d Cir. 2007) (quoting United States v. Thompson/Center Arms Co., 504 U.S. 505, 517 (1992)). These weapons are grouped together under the NFA's definition for "firearm,' which is a term of art, and includes such weapons as machine guns, sawed-off shotguns, hand grenades, and silencers; most conventional firearms are not within its scope or control. See 26 U.S.C. § 5845(a)-(f); see also United States v. Fortes, 141 F.3d 1, 7 (1st Cir. 1998) (Pollak, J. sitting by designation ) (holding that the possession of an NFA firearm is a "violent felony" within the meaning Armed Career Criminal Act and describing a "very substantial difference between possession of a generic 'firearm' and possession of one of the specialized weapons singled out for particularized treatment by [the NFA].").

The NFA does not create an outright ban on these types of weapons. Rather, it heavily regulates them, establishing "taxation, registration, reporting, and recordkeeping requirements for

businesses and transactions involving statutorily defined firearms, and requires that each firearm be identified by a serial number." Staples, 511 U.S. at 627-28 (Stevens, J. dissenting). As an enforcement provision, the NFA provides for twelve "prohibited acts" to enforce the regulations for these specific "firearms," which are codified at 26 U.S.C. § 5861:

> It shall be unlawful for any person –
>
> **(a)** to engage in business as a manufacturer or importer of, or dealer in, firearms without having paid the special (occupational) tax required by section 5801 for his business or having registered as required by section 5802; or
>
> **(b)** to receive or possess a firearm transferred to him in violation of the provisions of this chapter; or
>
> **(c)** to receive or possess a firearm made in violation of the provisions of this chapter; or
>
> **(d)** to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record; or
>
> **(e)** to transfer a firearm in violation of the provisions of this chapter; or
>
> **(f)** to make a firearm in violation of the provisions of this chapter; or
>
> **(g)** to obliterate, remove, change, or alter the serial number or other identification of a firearm required by this chapter; or
>
> **(h)** to receive or possess a firearm having the serial number or other identification required by this chapter obliterated, removed, changed, or altered; or
>
> **(i)** to receive or possess a firearm which is not identified by a serial number as required by this chapter; or
>
> **(j)** to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter; or
>
> **(k)** to receive or possess a firearm which has been imported or brought into the United States in violation of section 5844; or
>
> **(l)** to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false.

Included in this section is the operative provision in this case, § 5861(i), which makes it unlawful to receive or possess a firearm that is not identified by a serial number. 26 U.S.C. § 5861(i). Another "prohibited act" under this section is articulated at § 5861(d), which makes it unlawful for

an individual to receive or possess a firearm that is not registered to him. 26 U.S.C. § 5861(d). While there are no Supreme Court cases interpreting the scienter requirements for the specific section at issue in this matter – § 5861(i) – there are two principal cases in which the Court has interpreted its companion provision, § 5861(d), which are instructive as to the Court's task here: United States v. Freed, 401 U.S. 601 (1971) and Staples v. United States, 511 U.S. 600 (1994).

### B.  United States v. Freed

In United States v. Freed, the defendants were indicted with possessing hand grenades that were not registered to them, in violation of § 5861(d). Freed 401 U.S. at 601. The district court dismissed the charges against the defendants because, inter alia, the indictment failed to allege scienter as to the fact that the hand grenades were not registered. Id. at 601, 607. In concluding that the district court "erred in dismissing the indictment for absence of an allegation of scienter," the Court looked to the plain language of the statute in question, and concluded that it required "no specific intent or knowledge that the hand grenades were unregistered" in order for there to be a violation of § 5861(d). Id. at 607. Further, the Supreme Court refused to read such a knowledge requirement into the Act due to the purpose and scope of the NFA, referring to the Act as a "regulatory measure in the interest of the public safety, which may well be premised on the theory that one would hardly be surprised to learn that possession of hand grenades is not an innocent act." Id. at 609.

Freed, however, did not completely resolve the mens rea issue with regard to NFA violations. Since the defendants in Freed knew that they possessed hand grenades – what the Court described as "highly dangerous weapons" – the Court reasoned that the knowing possession of such items was enough to put an individual on notice that his possession could be subject to criminal sanction and regulation. Id. at 609 (citing and quoting United States v. Balint, 258 U.S. 250, 253-54 (1922) ("[The Narcotic Act of 1914's] manifest purpose is to require every person dealing in drugs to ascertain at his peril whether that which he sells comes within the inhibition of the statute, and if he

sells the inhibited drug in ignorance of its character, to penalize him.")). This rationale leaves open a situation where the defendant does not actually know what type of weapon he has; the Court addressed this scenario in <u>Staples v. United States</u>.

### C. <u>Staples v. United States</u>

In <u>Staples</u>, the defendant admitted to knowingly possessing an AR-15 rifle. <u>Staples</u>, 511 U.S. at 603. An AR-15, as manufactured, is only a semi-automatic rifle; accordingly, while a firearm in the conventional sense of the word, it is not a statutory "firearm" under the NFA. <u>Id.</u> at 603. The firearm in question, however, had been modified to be "fully automatic," making it a "machinegun" and thus a "firearm" subject to regulation under the Act. <u>Id.</u> The defendant professed ignorance as to the "fully automatic" capabilities of the rifle in question, and as such, asserted that he should not be held accountable for failing to register the weapon. <u>Id.</u> at 603-04. The Supreme Court granted certiorari to address the mens rea element, and concluded that to obtain a conviction under § 5861(d), "the Government should have been required to prove that petitioner knew of the features of his AR-15 that brought it within the scope of the Act" – specifically, the characteristics of the weapon that made it a "firearm" as defined under the NFA. <u>Id.</u> at 619; <u>id.</u> at 604 & 609.

The rationale for the holding is <u>Staples</u> has its root in a distinction between the statutorily defined "firearms" that the NFA regulates, and more typical firearms that have a history of lawful ownership in the United States. Specifically, the Court reasoned that certain types of weapons – namely, the statutory "firearms" under the NFA – have a stigma attached to them, and thus their mere possession alerts their owners to probable regulation. <u>Id.</u> at 611-12 ("Of course, we might surely classify certain categories of guns – no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation – as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in *Freed*."); <u>id.</u> at 612 n. 6 ("The truncated *mens rea* requirement we have described applies precisely because the *court* has determined that the statute regulates in a field where knowing possession of some general

class of items should alert individuals to probable regulation."); id. at 609 (interpreting Freed to stand for the proposition that the knowing possession of an NFA "firearm" is not an entirely "innocent" activity). However, since weapons falling outside the scope of the NFA "have been widely accepted as lawful possessions," the Court interpreted § 5861(d) as "requiring proof of knowledge of a weapon's characteristics" in order to ensure that the law would not unfairly punish the innocent. Id. at 611-12.

In establishing this mens rea requirement, the Court in Staples was explicit that it did not disturb its primary holding in Freed, namely, that "§ 5861(d) does not require proof of knowledge that a firearm is *unregistered*." Id. at 609 (emphasis in original). Indeed, the Court in Staples expressly concluded that "different elements of the same offense can require different mental states" – referring to the contrast between (1) requiring knowledge as to whether the weapon in question has the characteristics that make it a "firearm" under the NFA, the holding in Staples, and (2) that a defendant need not know that his weapon is unregistered under § 5861(d), the holding in Freed. See Staples, 511 U.S. at 609.

### D.    The Rationale of Freed and Staples Apply to § 5861(i)

With an understanding of the purpose and scope of the NFA, as well as a simple glance at the structure of the "prohibited acts" listed at § 5861, it clear why all of the Circuit Courts to address the issue have applied the Supreme Court's interpretation of § 5861(d) in Freed and Staples to violations of § 5861(i). The two subsections are functionally identical. Indeed, both sections share the same: (1) wording, in that neither states that a defendant must "know" of the regulation in question – i.e., the serial number or registration requirement; (2) structure,[2] since both regulate "firearms" as defined by a different portion of the statute; and (3) purpose, due to the fact that both

---

[2] See Ruiz, 253 F.3d at 637 ("Here we decide that the mens rea requirements are the same for the two sections of the statute [Sections 5861(d) and 5861(i)]. The structure of the sections is very similar. The term 'firearm' is used the same way in §§ 5861(d) and (i). Also, the definition of 'firearm' in § 5845(a) applies to both sections. Therefore the features that bring a firearm under the Act in § 5861(d), are the same features that bring a firearm under the Act in § 5861(i).").

sections strictly regulate a certain class of firearms that Congress has associated with gangsters and criminal activity. Accordingly, since the Supreme Court's opinions in Freed and Staples rest on the characteristics and purpose behind § 5861(d) in its construction,[3] it is easy to see, given the similarity between the two provisions, why four Circuit Courts have interpreted § 5861(i) in the same manner.

Moreover, given the fact that § 5861(d) and § 5861(i) work hand-in-hand[4] in the regulation of NFA firearms as part of the same statutory scheme, these two provisions should be interpreted in a cohesive, similar manner. E.g., FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 133 (2000) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme. . . . A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' . . . and fit, if possible, all parts into an harmonious whole . . . .") (citations omitted). Indeed, it would be difficult to reconcile creating different mens rea requirements for § 5861(d) and § 5861(i) in light of the underlying purposes behind the Act – i.e., the regulation of gangster-type weapons – from an enforcement standpoint. Cf. Freed, 401 U.S. at 616 (Brennan, J. concurring in the judgment) ("Without exception, the likelihood of governmental regulation of the distribution of [NFA weapons] is so great that anyone must be presumed to be aware of it. In the context of a taxing and registration scheme, I therefore think it reasonable to conclude that Congress dispensed with the requirement of intent in regard to the unregistered status of the weapon, as necessary to effective administration of the statute."). Accordingly, the Court should refrain from creating such a hindrance here.

---

[3] See supra at Sections A, B and C.

[4] One of the ways in which NFA "firearms" are identified in the National Firearm Registration and Transfer Record is by serial number. See 26 U.S.C. § 5842(a).

### E.      The Defendant's Arguments

The defendant raises two arguments in support of his proffered instruction for § 5861(i) that the government did not address in its letter brief.[5]  First, the defendant asserts that the Supreme Court's holding in <u>Freed</u> is not controlling because that case involved hand grenades – "highly dangerous weapons" – while this case involves a silencer (presumably, not a "highly dangerous weapon"). (D.I. 30 at p.2).  Second, the defendant contends that, due to the "unique facts of the present case," the government should have to prove that the defendant knew of the silencer's lack of a serial number. (<u>Id.</u>).  These arguments lack merit and are addressed below.

        1.      The Supreme Court's Holding in <u>Freed</u> Applies to NFA "Firearms" Generally, Including Silencers.

As discussed above, in <u>Freed</u>, the Supreme Court concluded that the government did not have to prove that the defendants in question knew that their NFA firearms – hand grenades – were unregistered. <u>See</u> <u>supra</u> Section B.  The Court in <u>Freed</u> based this conclusion, in part, on the notion that due to the nature of a hand grenade, "one would hardly be surprised to learn that possession of hand grenades is not an innocent act" and thus subject to strict regulation. <u>Id.</u> at 609.  Despite the defendant's argument, the Supreme Court has subsequently interpreted <u>Freed</u> to apply to NFA firearms generally, including silencers. <u>E.g.</u>, <u>Staples</u>, 511 U.S. at 609 (interpreting <u>Freed</u> to stand

---

[5] The defendant also asserts that the Court should accept its proffered instruction for § 5861(i) due to the court's opinion in <u>United States v. Haywood</u>, 363 F.3d 200 (3d Cir. 2004), wherein the Third Circuit interpreted the mens rea requirement for 18 U.S.C. § 922(k) (making it unlawful for an individual to "knowingly" possess a firearm with a "removed, obliterated, or altered" serial number). The government distinguished this case in its letter brief, due in large part to the different wording of the statutes. (D.I. 29 at p.5). One additional point merits discussion, however. In his letter brief, the defendant also asserts that the government, in charging a violation of 26 U.S.C. § 5861(i), was attempting to circumvent the "knowledge requirement" of 18 U.S.C. § 922(k) – a crime which it purportedly "could have just as easily charged." (D.I. 30 at p.3). This is simply incorrect. The silencer in question did not have a "removed, obliterated, or altered" serial number; rather, the silencer never had a serial number at all – it was specifically manufactured to fit the defendant's Colt .45 that was shipped to law enforcement. Accordingly, 18 U.S.C. § 922(k) was never a viable charging alternative for the government in this case. Further, even if it were, the NFA analog of 18 U.S.C. § 922(k) is not § 5861(i); rather, it is 26 U.S.C. § 5861(h) (prohibiting any person "to receive or possess a firearm having the serial number or other identification required by this chapter obliterated, removed, changed, or altered.").

for the proposition that the knowing possession of an NFA "firearm" is not an entirely " innocent" activity); see also Draft Model Criminal Jury Instructions, 3d Circuit, § 6.26.5861 Comment (stating that the government "does not need to prove that the defendant knew the firearm was unregistered," regardless of what type of "firearm" is charged under § 5861(d)). Indeed, the Court explicitly applied the Freed doctrine to a silencer in Rogers v. United States, 522 U.S. 252 (1997). See id. at 244-45 (plurality opinion) ("It is not, however, necessary to prove that the defendant knew that his possession was unlawful, or that the [silencer] was unregistered.") (citing Freed). Accordingly, this argument is without merit.[6]

        2.      There Is No Legal Authority to Fashion an "Extra Element" for the Government to Prove Based on the Facts of the Case.

In his letter brief and at oral argument at the pretrial conference the defendant argued that, regardless of all of the case law on point, the government should be required to prove a higher mens rea in this specific case due to the fact that the government was involved in an undercover investigation and made the silencer in question.[7] This argument has no legal foundation. The

---

[6] The defendant also appears to assert that since Maryland law does not explicitly prohibit the possession of silencers, this should have some bearing on the Court's decision here. (D.I. 30 at p.2). This argument, however, overlooks the explicit intent of Congress to strictly regulate NFA "firearms" – a specific subset of weapons that it has determined are either highly dangerous and/or associated with nefarious activity. See supra at Section A. A silencer is one such weapon. See id.; see also United States v. Kayfez, 957 F.2d 677, 679 (9th Cir. 1992) ("Further, one rarely possesses a silencer for 'sport, recreation, or collection' or for any other lawful use."). The fact that a state does not prohibit the possession of certain NFA weapons surely would not alter the mandate of a federal law, as interpreted by the Supreme Court, which provides that these "firearms" are of such a dangerous and criminal nature that their very possession is enough to alert an individual to strict regulation. See supra at Sections A, B & C.

Stated another way, Maryland law also allows individuals to own machine guns. See Md. Code Ann., Crim. Law § 4-402(d) (stating that the statute does not prohibit "the possession of a machine gun for a purpose that is manifestly not aggressive or offensive"). This law would not, however, undermine the Court's rationale in Staples with regard to the machine gun at issue in that case. Staples, 511 U.S. at 611-12 ("Of course, we might surely classify certain categories of guns – no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation – as items the ownership of which would have the same quasi-suspect character we attributed to owning hand grenades in *Freed*.").

[7] The defendant has been reluctant to pursue an entrapment defense in this case as a remedy to his fairness concerns. Given the facts, this is understandable. From the very beginning, the

defense has not provided any authority – and the government can find none – for the proposition that the Court may, in interpreting congressional intent with regard to the essential elements of a statute, fashion an "extra element" for the government to prove with regard to a defendant due to the underlying facts of a particular case. Such a practice would obviously conflict with the Court's duty to interpret statutes in a consistent manner with regard to all defendants, as well fundamental concepts such as precedent and case law. Indeed, as stated in Corpus Juris Secundum: "The court should be consistent in their construction of statutes and should establish a stable interpretation, and statutes should be so construed as to be applicable under all conditions and factual situations." 82 C.J.S. Statutes § 307 (2007). For similar reasons, the Court should resist the defendant's invitation to do otherwise here.

---

defendant was pursuing an illegal course of conduct, and he knew it. As the government intends to prove at trial, the defendant – a person who, due to his criminal history is prohibited from having any firearms at all – was attempting to purchase a silencer to muffle the gunshots of his (illegally possessed) Colt .45 handgun. Further, in his attempts to procure this silencer, he repeatedly used a false name, listed a false home address for himself, acknowledged that he was doing illegal activity, and asked the undercover officer, upon meeting him for the first time, if he was with the police. These are, quite simply, not the actions of an individual who was unfairly duped into criminal activity, or who thought he was engaging in legitimate conduct.

## CONCLUSION

For the foregoing reasons, the government respectfully asserts that the Court should accept its proffered jury instruction for the elements required under 26 U.S.C. § 5861(i).

                                              Respectfully submitted,

                                              COLM F. CONNOLLY
                                              UNITED STATES ATTORNEY

                                BY:  /s/ Shawn A. Weede
                                              Shawn A. Weede
                                              Shannon Thee Hanson
                                              Assistant United States Attorneys

Dated: December 14, 2007